UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __9/30/2022__

RICHARD E. GORDON,

                                  Plaintiffs,

   -against-

SALO AIZENBERG and MAYTAL ASSET
MANAGEMENT, LLC,

                                  Defendant.

No. 7:21 CIV 51 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

       Plaintiff Richard E. Gordon ("Plaintiff" or "Gordon") brings this action against Defendants Salo Aizenberg ("Aizenberg") and Maytal Asset Management, LLC d/b/a Downtown Investment Advisory ("DIA") (together, "Defendants") for their alleged inappropriate management of his discretionary advisory account that resulted in staggering losses. Plaintiff brings claims of breach of fiduciary duty, negligence, negligent misrepresentation, negligent supervision, and violation of Section 30(a) of the Securities Exchange Act of 1934 in his Amended Complaint. Presently before the Court is Defendants' motion to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).

       For the following reasons, Defendants' motion to dismiss is GRANTED.

## FACTUAL BACKGROUND

       The following facts are derived from the Amended Complaint and the documents referenced therein and are assumed as true for purposes of this motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiff Richard E. Gordon is a citizen of South Dakota who resides in Los Cabos, Mexico, where he serves as a pastor. ("Am. Compl.," ECF No. 16 at 2.) In August 2018, Gordon inherited approximately $650,000 from his uncle. (*Id.* at 5.) After receiving the inheritance, Gordon looked for somebody to help with conservatively investing the funds. (*Id.*) Gordon stumbled upon an online article written by Defendant Salo Aizenberg. (*Id.*)

Aizenberg, a resident of Scarsdale, New York, is the owner and manager of Downtown Investment Advisory ("DIA"). (*Id.* at 2.) DIA is a registered investment agent that provides investment management services. (*Id.*) The DIA website describes Aizenberg as an expert investment professional with 20 years of institutional fixed income investing experience prior to founding DIA, touts his prior background working on large portfolios, and highlights he has an MBA in finance from Columbia University Business School. (*Id.*)

Gordon reached out to Aizenberg to discuss his goals of investing his funds in a conservative manner to preserve and protect the principal funds and for Gordon's family to live off any interests or gains. (*See id.* at 6.) Aizenberg told Gordon he preferred to talk over phone. (*Id.* at 5.) When Gordon called Aizenberg, he expected to seek conservative returns on his inheritance but "it was Aizenberg who ultimately pushed Gordon into a strategy that utilized excessive margin." (*Id.* at 6.) Aizenberg represented that the Defendants' investment strategy was extremely safe, a third less risky than the equities market, and avoided riskier market segments such as oil and gas. (*Id.*) Furthermore, Aizenberg represented himself as a "superior risk manager" with many years of experience and expertise. (*Id.*) Based on Aizenberg's representations, Gordon felt comfortable having Defendants manage his investment funds. (*Id.* at 7.)

On August 31, 2018, Aizenberg emailed Gordon an Investment Advisory Contract ("the Contract"). (*Id.* at 7.) Gordon reviewed the Contract and raised concerns that it suggested

Defendants would employ a strategy that utilized more risk than previously discussed. (*Id.*) Aizenberg responded that this was not the case, and reiterated Defendants' strategy was substantially less risky than investing in equities and that they would manage the risk in line with Gordon's conservative investment objectives. (*Id.*) The Contract granted Defendants discretionary authority over Gordon's advisory account at DIA and set a fee of 1.00% per annum of the assets under Defendants' management. (*Id.* at 8.) Aizenberg told Gordon that the Contract is just a standard agreement with boilerplate language. (*Id.*) Thereafter, Gordon signed the Contract and opened an Advisory Account with Defendants with the $650,000 inheritance funds. (*Id.*)

Contrary to Aizenberg's representations, Defendants applied investment strategies that presented high risks and included a portfolio of investments that were predominantly structured to provide high current yield and used high margin ratios. (*Id.* at 9.) In September 2018, the account statement showed a "long" position in stocks and bonds of $953,190.73, a "short" position of -$302,858.62, and an ending value of $650,332.12. (*Id.*) The "short" position, which represented margin debt, was approximately 46% of the account value. (*Id.*) By the end of December 2018, the "short" position was at -$608,549.94, accounting for over 100% of the account value, and the account ending value was $594,371.62. (*Id*. at 10.) Plaintiff alleges that at this time he did not appreciate or understand that Defendants placed him in a high-risk strategy.

In June 2019, Gordon inherited an additional $1.2 million from his aunt. (*Id.* at 10.) Upon contacting Aizenberg about this second inheritance, Aizenberg represented that these funds can be consolidated with Gordon's other funds entrusted to Defendants to be managed in the same manner. (*Id.*) Prior to transferring the second inheritance, Gordon, his wife, and Aizenberg had a conference call during which Aizenberg reiterated Defendants' strategy was safe, that no

3

investments would be made in high-risk sectors, that Aizenberg was an expert risk manager, and that Defendants have properly managed the account in a conservative manner consistent with how Aizenberg preserves his own family's portfolio. (*Id.*) Gordon deposited the additional $1.2 million into the account managed by Defendants. (*Id.*)

Contrary to Aizenberg's representations, Defendants continued investing Gordon in high-risk, heavily margined investment strategy, inconsistent with Gordon's objectives. (*Id.*) By the end of August 2019, the Advisory Account had a "long" position of $3,113,142.36, a "short" position of -$1,203,153.64, and an ending value of $1,909,988.72. (*Id.*)

On January 7, 2020, Aizenberg sent Gordon and his wife an annual account performance review. (*Id.* at 11.) Plaintiff alleges that Aizenberg expressly recognized in the email that Gordon was not interested in outsized gains and of his goal to preserve and protect the principal for his family. (*Id.*) But Aizenberg's email failed to disclose that the growing margin debt of the Advisory Account had reached $1,866,090.25 by end of December 2019, close to 100% of account value. (*Id.*) Furthermore, Aizenberg did not disclose that the stocks and bonds in the account held positions in existing leveraged investment vehicles, which Plaintiff alleges were predominantly structured to provide high current yield and at times the issuers were leveraged. (*See id.* at 11–12.)

In February 2020, amidst the start of the COVID-19 pandemic, Gordon became concerned of the risky environment and instructed Aizenberg to liquidate the Advisory Account into cash. (*Id.* at 13–14.) Aizenberg responded that liquidating at that time would be a "dumb" mistake and he allegedly refused to comply with Gordon's instructions. (*Id.* at 14.) Aizenberg insisted Gordon stay the course, belittled the pandemic as overhyped, and ridiculed Gordon for wanting to turn off

what Aizenberg referred to as the "ATM machine." (*Id.*) Plaintiff alleges he did not appreciate the risks and consequences of Defendants' strategy and believed Aizenberg. (*Id.*)

Plaintiff stayed in touch with Aizenberg by phone throughout the subsequent weeks. (*Id.*) By February 26, 2020, the margin debt for the Advisory Account was over $2 million and exceeded 100% of the ending value of that day. (*Id.* at 14–15.) On February 27, 2020, Aizenberg sent an email to his clients, including Gordon, which stated that "coronavirus fears are overblown" and encouraged "'staying the course' and not making panic moves." (*Id.* at 15.) In a follow-up email to Gordon, Aizenberg stated that Gordon's portfolio is well-diversified. (*Id.* at 15, 16.)

Plaintiff alleges Aizenberg's demeanor over the phone became less friendly. (*Id.* at 16.) Fearful that Aizenberg would stop responding to him, Gordon emailed Aizenberg encouraging messages in hopes he would look out for his family's best interest. (*Id.*) Gordon alleged he contacted Aizenberg everyday sharing his concerns and pled with Aizenberg not to lose all his money. (*Id.*) The market crashed over 40% and by March 17, 2022, the account had a Negative Liquidation Value of $1,280,456.36, a margin ratio of 71.40%, and $366,186.82 in available funds. (*Id.* at 17.) Gordon emailed Aizenberg with concerns about junk bond funds in his portfolio and asked if he should "have a number perhaps (sub 1 mm) to sell everything to protect my family." (*Id.*) Aizenberg responded that Gordon's margin continues to be managed, and that "there is still plenty of cushion. I would hate to lock in losses that I believe will reverse. Your portfolio is quite diversified with some 70 positions. They are not all going to bankrupt, let alone any! I don't know when things may change [I] will continue to monitor very closely." (*Id.* at 18.) On March 19, 2020, Aizenberg emailed Gordon staying he "intend[s] to diversify some more, as you do have some concentrated positions." (*Id.* at 19.) Gordon called Aizenberg and told him if he had followed Gordo's instructions in late February to liquidate, this situation would not have occurred,

and that Aizenberg has failed to reduce the level of risk. (*Id.*) On March 26, 2020, Aizenberg communicated with Gordon in an apologetic manner and told him he would further diversify the portfolio and would no longer use margin on his account. (*Id.*)

Plaintiff alleges he continued to ask Aizenberg to liquidate his account but "each time Aizenberg refused to do so." (*Id.* at 20.) On March 30, 2020, Gordon emailed Aizenberg stating "I'm writing to you tonight requesting that all my positions be sold on [M]onday March 30, 2020 and that my account goes to all cash by the end of the day." (*Id.* at 21.) Aizenberg responded "OK will work as best as possible to move to cash." (*Id.* at 22.) Plaintiff alleges he had a $1.3 million loss on his Advisory Account. (*Id.*)

## PROCEDURAL BACKGROUND

Plaintiff filed an action against Defendants at the Supreme Court of the State of New York, County of New York on December 2, 2020. (*See* ECF No. 3.) On January 5, 2021, Defendants removed the action to this Court. (*Id.*) On April 8, 2021, Plaintiff filed an Amended Compliant. (ECF No. 16.) On October 6, 2021, Defendants moved to dismiss Plaintiff's Amended Complaint. (ECF Nos. 23–25.) Plaintiff opposed the motion. (ECF Nos. 27–28.) Defendants filed a reply memorandum of law in support of their motion to dismiss. (ECF No. 26.)

## LEGAL STANDARD

### I.   Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. While

the Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* at 662, 678 (quoting *Twombly*, 550 U.S. at 555). The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

## II. Federal Rule of Civil Procedure 9(b)

While the rules of federal pleading typically require a "short and plain statement," *see* Fed. R. Civ. P. 8, fraud claims have heightened pleading requirements. *See* Fed. R. Civ. P. 9(b). To meet Rule 9(b)'s pleading standard, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (citing *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

## DISCUSSION

Plaintiff brings claims of breach of fiduciary duty, negligence, and negligent misrepresentation against both Defendants and claims of negligent supervision and violation of Section 20(a) of the Securities Exchange Act of 1934 against Defendant DIA only. (*See* Am. Compl. at 22–27.) Defendants argue all claims must be dismissed for failure to state a claim pursuant to Rule 12(b)(6) and Rule 9(b). (*See* "Defs. Mot.," at ECF No. 25.)

I. **Breach of Fiduciary Duty**

Plaintiff alleges Defendants breached their fiduciary duties to him. (Am. Compl. at 22–24.) To sustain a claim of breach of fiduciary duty under New York law, "[Plaintiff] must prove 'the existence of a fiduciary relationship, misconduct by the [Defendants], and damages directly caused by the [Defendants'] misconduct.'" *Margrabe v. Sexter & Warmflash, P.C.*, 353 F. App'x 547, 549 (2d Cir. 2009) (quoting *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 204 (S.D.N.Y. 2008)).

Plaintiff alleges that Defendants, as investment advisers with discretionary authority over his account, owed him fiduciary duties. (Am. Compl. at 22.) Plaintiff alleged he entrusted the inheritance funds to Defendants' management, expecting their highest degree of care, loyalty, and with due regard for his conservative investment objective and risk tolerance. (*Id.* at 22–23.) Plaintiff alleged Defendants breached their fiduciary duties when they invested his funds in a high-risk manner, concentrated the investments in illiquid or low-quality bonds, failed to diversify the investments, utilized excessive margins, failed to manage the account consistent with Plaintiff's conservative objectives, misrepresented the nature of the risks involved, and failed to liquidate the Advisory Account when requested. (*Id.* at 24.)

The Court finds that Plaintiff has not sufficiently alleged the existence of a fiduciary relationship. Plaintiff alleges that he and the Defendants were parties to an Investment Advisory Contract. (Am. Compl. at 7.) Under the contract, Defendants were to manage Plaintiff's advisory account for a fee of 1% per annum of the assets under management. (*Id.* at 8.) Under New York law, to show Defendants had a fiduciary duty distinct from an express contract, Plaintiff must sufficiently allege that Defendants occupied a position of trust or special confidence. *See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (collecting cases). Plaintiff's various allegations that he has "trust and confidence in Aizenberg"

and that he "believed and trusted that Aizenberg had been keeping his word and managing the Advisory Account consistent with Gordon's conservative objective" are insufficient to establish that Defendants held a position of trust or special confidence. "Whatever trust and confidence was placed in [Defendants] had solely to do with [their] carrying out [their] obligations under the contract." *Id.* Plaintiff's allegations that he trusted and believed in Aizenberg do not convince the Court otherwise. Indeed, a plaintiff's "subjective beliefs and conclusory allegations that a 'special' relationship existed are insufficient to establish a fiduciary duty." *Zorbas v. U.S. Trust Co., N.A.*, 48 F. Supp. 3d 464, 486–87 (E.D.N.Y. 2014). The allegations in the Amended Complaint seem to reflect a relationship between Plaintiff and Defendants that was between the typical investment-manager relationship. Accordingly, the Court finds that Plaintiff has not sufficiently alleged a breach of fiduciary duty and this claim is DISMISSED without prejudice.

## II.     Negligence

Plaintiff brings claims of negligence against both Defendants. (Am. Compl. at 24–25.) To establish a prima facie case of negligence under New York law, "a plaintiff must demonstrate '(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty, and (3) injury to the plaintiff as a result thereof.'" *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 210 (2d Cir. 2014) (quoting *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 428 (2d Cir. 2013) and *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333 (1981)). Furthermore, Plaintiff must establish that his injury was foreseeable. *See Sanchez v. State of New York*, 99 N.Y.2d 247, 252 (2002) ("[L]iability does not attach unless the harm is within the class of reasonably foreseeable hazards that the duty exists to prevent."). "Under New York law, a breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself

9

has been violated." *Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012).

Plaintiff alleges Defendants owed him a duty of care to invest and manage the Advisory Account consistent with his conservative investment objectives and that they breached such duty. (Am. Compl. at 24–25.)  As discussed *supra*, Plaintiff has not sufficiently alleged any duties independent of the Investment Advisory Contract.  Accordingly, the Court finds that Plaintiff has not sufficiently alleged that there was any legal duty independent of the contract between the parties that had been violated so as to give rise to a tort claim.  *See Bayerische Landesbank*, 692 F.3d at 58.  Accordingly, Plaintiff's negligence claim is DISMISSED without prejudice.

### III.     Negligent Misrepresentation

Plaintiff brings a claim of negligent misrepresentation against both Defendants.  (Am. Compl. at 25.)  "Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).  Upon careful review of the Amended Complaint, the Court concludes that Plaintiff's vague allegations that Defendants made false representations regarding the risk level of the investments is insufficient to meet the heightened standards of Rule 9(b).  Accordingly, this claim is too DISMISSED without prejudice.

### IV.   Negligent Supervision

Plaintiff brings a negligent supervision claim against DIA on the basis that DIA had a legal duty to supervise Aizenberg. (Am. Compl. at 26.) A claim for negligent supervision in New York is a derivative cause of action that applies where an employee acts negligently and committed a negligent act on an employer's premises and his or her employer "'knew or should have known of the employees' propensity for the conduct, which caused the injury' prior to the injury's occurrence." *Valenti v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 330 (S.D.N.Y. 2011). Because the Court finds that Plaintiff has not sufficiently alleged a negligent claim against Aizenberg, the Court DISMISSES this claim against DIA without prejudice.

### V.   Violation of Securities Exchange Act of 1934

Plaintiff alleges Defendants violated Section 20(a) of the Securities Exchange Act of 1934. (Am. Compl. at 27.) Section 20(a) of the Securities Exchange Act of 1934 provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 21(d)), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." Notably, Section 20(a) does not create a primary liability or cause of action, but instead presupposes a primary violation elsewhere by a controlled person.

15 U.S.C. § 78t(a); *see In re Am. Express Co. Sec. Litig.*, 2008 U.S. Dist. LEXIS 74372 (S.D.N.Y. Sep. 26, 2008). Furthermore, "[t]o state a claim for secondary liability for a control person under Section 20(a) of the Exchange Act, Plaintiffs must allege (1) a primary violation of the Exchange Act by a controlled person, (2) actual control by the defendant, and (3) the controlling person's culpable participation in the primary violation." *In re SAIC, Inc.*, 2013 U.S. Dist. LEXIS 142606, at *45-46 (S.D.N.Y. Sep. 30, 2013). Because Plaintiff has not alleged any primary violation of

the Securities Exchange Act of 1934 against the Defendants, his Section 20(a) claim must be DISMISSED.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. All of Plaintiff's claims are DISMISSED without prejudice. Plaintiff is granted leave to file a Second Amended Complaint by October 24, 2022 in accordance with this Opinion. If Plaintiff fails to timely file an Amended Complaint, the claims dismissed without prejudice shall be deemed dismissed with prejudice. Defendants shall have until November 14, 2022 to file a responsive pleading.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 23.

Dated: September 30, 2022
        White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge